**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION**

DAWN L. REDDING,

Plaintiff,

v. CASE NO. 4:04cv257-RH/WCS

STATE OF FLORIDA, DEPARTMENT OF JUVENILE JUSTICE,

Defendant.

_________________________________/

**ORDER DENYING DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

This is an employment discrimination action. Plaintiff, a supervisor at a juvenile detention facility whose performance had by all accounts been outstanding, made a good faith claim of gender discrimination. Plaintiff was promptly subjected to a long and pervasive campaign of retaliation. The retaliatory actions included keeping plaintiff on an unfavorable shift, issuing an unfounded verbal reprimand and four unfounded "counseling" memoranda, canceling training that plaintiff had been scheduled to receive, providing plaintiff insufficient staff, undermining plaintiff's relations with her staff, assigning plaintiff unfavorable

duties, refusing to allow plaintiff to return to work after a medical absence until she provided an extraordinary verification of fitness for duty, refusing for nearly a month to allow plaintiff to work while wearing an unobtrusive heart monitor as directed by her physician, constantly treating plaintiff disrespectfully, and generally subjecting plaintiff to an abusive work environment on a daily basis. After plaintiff's attitude progressively worsened and she became insubordinate—as a result, in substantial part, of her shoddy treatment—she was fired.

Plaintiff brought this action alleging gender discrimination and retaliation. After a seven-day trial, the jury returned a special interrogatory verdict finding that plaintiff was not the victim of gender discrimination, that plaintiff was subjected to an abusive work environment in retaliation for having complained in good faith of gender discrimination, that retaliation was a substantial or motivating factor in plaintiff's termination, and that plaintiff would have been terminated anyway, even in the absence of retaliation. This was a verdict for defendant on the gender discrimination claim, for plaintiff on the retaliatory abusive environment claim, and for defendant on the retaliatory termination claim. The jury awarded damages of $13,000 on the retaliatory abusive environment claim.

Defendant now has renewed its motion for judgment as a matter of law as originally made during the trial. Defendant asserts, in effect, that the retaliation to which plaintiff was subjected was not substantial enough to be actionable. I deny

the motion.

In order to prevail on a claim of employment discrimination, an employee must show that he or she suffered effects that rise to a required threshold level of substantiality. The issue here is whether defendant's retaliation against plaintiff rose to that level.

The many opinions addressing this issue in this circuit and elsewhere have not always used the same language to describe the required level of substantiality. But the principles that emerge from the opinions are, at least to the extent necessary for resolution of the case at bar, clear and consistent.

First, it is clear that Title VII prohibits both discrimination based on prohibited characteristics such as race or gender, on the one hand,[1] and retaliation for having opposed or participated in an investigation of such discrimination, on the other hand.[2] For convenience, I refer in this order to claims asserting discrimination based on prohibited characteristics as race or gender claims, without

[1] The statute makes it an "unlawful employment practice" to "fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. §2000e-2(a)(1).

[2] The statute prohibits discrimination against any employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. §2000e-3(a).

referring to the other (equally important) prohibited characteristics.

Second, it also is clear that the requirement that a plaintiff meet a threshold level of substantiality applies both to race or gender claims and to retaliation claims. Whether the threshold is the *same* for both categories of claims may be less clear, but the better view is that it *is* the same.[3] Indeed, the Eleventh Circuit has repeatedly cited interchangeably its various decisions dealing with the required level of substantiality in race or gender cases, on the one hand, and retaliation cases, on the other.[4] More importantly, there is an enormous practical benefit to

---

[3] The statutory language is not identical. *See supra* notes 1 & 2. In particular, the ban on race or gender discrimination refers to "terms, conditions, or privileges of employment," a phrase that is absent from the retaliation provision. The phrase has been highlighted in explaining that the statute goes beyond financial effects. *See, e.g., Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986). But the retaliation provision also clearly goes beyond financial effects, and the purposes of both the race and gender provision, on the one hand, and the retaliation provision, on the other, suggest no basis for treating them differently in this respect. Race and gender discrimination and retaliation are equally reprehensible, each should be prohibited even in the absence of direct financial effects, but neither should be actionable when the only effects are so minor as not to warrant the invocation of Title VII.

[4] *See, e.g.*, *Mosley v. Meristar Mgmt. Co.*, 137 Fed. Appx. 248, 252 (11th Cir. June 23, 2005) (unpublished opinion) (in race case, citing retaliation case); *Cooley v. Great So. Wood Preserving*, 138 Fed. Appx. 149, 158 (11th Cir. May 18, 2005) (unpublished opinion) (in retaliation case, citing race case); *Benefield v. Fulton County*, 130 Fed. Appx. 308, 313 (11th Cir. Apr. 29, 2005) (unpublished opinion) (in retaliation case, citing race case); *Wilbur v. Corr. Serv. Corp.*, 393 F.3d 1192, 1202 n.5 (11th Cir. 2004) (in sexual harassment case, citing retaliation case); *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (in retaliation case, citing race case); *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238-39 (11th Cir. 2001) (in race case, citing retaliation cases);

treating the standard as identical for both types of claims, which often are tried together to a single jury.[5] Neither side in the case at bar has taken issue with the proposition that the required level of substantiality is the same in race or gender claims and retaliation claims.

Various terms have been used in discussing the required level of substantiality. Thus, for example, courts have referred to "tangible" effects, always including within that term the loss of money as well as other direct financial impacts, and always making clear that such tangible effects are not the only effects covered by Title VII. Courts have referred to "adverse employment action," sometimes (but not always) as a synonym for any action that rises to the required level of substantiality. Courts also have referred to a "hostile work environment" or "abusive work environment," usually as a description of nonfinancial effects that reach the required level of substantiality. That is how I use the terms in this opinion.

The Supreme Court has repeatedly made clear that requiring a person to

---

*Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (in sexual harassment case, citing retaliation case).

[5] A retaliation claim is often tried together with the underlying race or gender claim, as occurred in the case at bar. Instructing the same jury on one required level of substantiality for a race or gender claim and a different required level of substantiality for a retaliation claim would impose a level of complexity and confusion that would serve the interests of nobody. For those of us who labor to conduct fair trials, this would be a nightmare.

work in a hostile or abusive environment because of race or gender is actionable. Thus, for example, in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993), the Court said that an employee who is subjected to a "severe or pervasive" hostile or abusive environment because of race or gender may recover under Title VII even without showing actual psychological harm. Although *Harris* was a sexual harassment case, the Court relied on the language of the statute prohibiting race or gender discrimination generally,[6] and the Court cited cases dealing not only with sexual harassment but with other forms of gender[7] and national origin[8] discrimination. The Court 's holding that an environment that is sufficiently "severe or pervasive" is actionable plainly applies not only to sexual harassment claims but also to other types of discrimination prohibited by Title VII. And because the required level of substantiality is the same for race or gender claims, on the one hand, and retaliation claims, on the other hand, subjecting an employee to a hostile or abusive environment in retaliation is actionable, just as is subjecting an employee to a hostile or abusive environment based on race or

---

[6] *See Harris*, 510 U.S. at 21, quoting 42 U.S.C. §2000e-2(a)(1).

[7] *See Harris*, 510 U.S. at 21, quoting *Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, 707 n.13, 98 S. Ct. 1370, 55 L. Ed. 2d 657 (1978).

[8] *See Harris*, 510 U.S. at 22, quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971).

gender. Neither side has taken issue with this proposition in the case at bar.[9]

None of these terms—tangible effects, adverse employment action, hostile or abusive work environment—are terms that jurors use in daily conversation. These or any other terms can be used in jury instructions to explain the governing concepts, so long as adequate definitions are given. In instructing the jury in the case at bar, I used the term "abusive work environment." I could as easily have said "adverse employment action" or coined any other term. What was important was the definition. I defined the term "abusive work environment" precisely in accordance with the Supreme Court's discussion of actionable conduct in *Harris*. The instructions thus also accorded with the law of the circuit—which of course comports with *Harris*—and with the standard instructions adopted by the Eleventh Circuit District Judges Association, which were themselves taken from *Harris* and

---

[9] None of the authorities in this area draws a bright line. Indeed, the Eleventh Circuit has explicitly chosen not to draw such a line:

> Although we do not doubt that there is some threshold level of substantiality that must be met for unlawful discrimination to be cognizable under the anti-retaliation clause, we need not determine in this case the exact notch into which the bar should be placed. It is enough to conclude, as we do, that the actions about which Wideman complains considered collectively are sufficient to constitute prohibited discrimination. We need not and do not decide whether anything less than the totality of the alleged reprisals would be sufficient.

*Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998).

the various decisions of the Eleventh Circuit. Although defendant asserted the evidence was insufficient to go to the jury at all, defendant did not object to the language of the jury instructions.

Thus the jury was told that it could return a verdict for Ms. Redding on the claim now at issue only if it found that she complained of gender discrimination in good faith and was subjected to an abusive work environment in retaliation for having done so. The jury was told further:

> A work environment is abusive only if (1) an employee is subjected to offensive acts or statements; (2) those acts or statements are unwelcome and have not been invited or solicited, directly or indirectly, by the employee's own acts or statements; (3) those acts or statements are so severe or pervasive that they materially alter the employee's work conditions; (4) a reasonable person, as distinguished from someone who is unduly sensitive, would find the workplace to be abusive; and (5) the employee personally believes the workplace environment is abusive.
>
> Whether a workplace environment is "abusive" can be determined only by considering all the circumstances, including the frequency of the offensive acts or statements, their severity, whether the acts or statements are physically threatening or humiliating, and whether they unreasonably interfere with the employee's work performance. The effect on the employee's mental and emotional well being is also relevant to determining whether the employee actually found the workplace environment to be abusive; but while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.
>
> Conduct such as occasional assignment of unpleasant duties, minor counseling or discipline, unfavorable evaluations, or occasional use of abusive language do not, without more, constitute an abusive

> environment. Only extreme conduct amounting to a material change in the conditions of employment constitutes an abusive environment.

Court's Instructions to the Jury (document 71), at 11-12.

The jury found that Ms. Redding was subjected to a severe or pervasive abusive environment in retaliation for her good faith claim of gender discrimination. The evidence supporting that finding was strong.

Ms. Redding worked at the Leon County Juvenile Detention Center, a residential facility for delinquent children operated by the defendant State of Florida Department of Corrections. Ms. Redding was promoted through the ranks to the position of juvenile detention officer supervisor. As the name implies, she supervised juvenile detention officers—the line officers who had primary direct contact with juvenile offenders. By all accounts, Ms. Redding's performance was outstanding. Indeed, those under her supervision gave her an unsolicited award in an apparently genuine demonstration of respect for her work.

In the fall of 2002, Alphonso Whitaker became the facility's assistant superintendent of operations and, as such, Ms. Redding's direct supervisor. In December 2002, Mr. Whitaker moved Ms. Redding from the day shift (with hours from 7:00 a.m. to 3:00 p.m.), to the midnight shift (with hours from 11:00 p.m. to 7:00 a.m.), ostensibly so that she could train a new officer who was assigned to the midnight shift. Ms. Redding was told the shift change would be temporary, and

she did not object. On January 31, 2003, however, Ms. Redding had a pivotal meeting with Mr. Whitaker about the shift change and other matters. Mr. Whitaker said Ms. Redding would be transferred to the evening shift (3:00 p.m. to 11:00 p.m.) and would not return to the day shift. This was a substantial hardship for Ms. Redding, who had school age children and nobody to keep them during that part of the day.

Ms. Redding promptly met again with Mr. Whitaker and with Richard Morrison, the superintendent of the facility, and complained in good faith that her reassignment constituted gender discrimination.[10]

There was a prompt and dramatic change in Ms. Redding's work history that both sides pinpointed to this very time. After a tumultuous 14 months, she was fired.

At trial, there was no dispute about whether there was a dramatic change in Ms. Whitaker's work record or when it occurred. The dispute, instead, was over

---

[10] The jury ultimately found the charge of gender discrimination unproven, but the jury also found there was a good faith basis for the charge. The finding of good faith was correct. Mr. Morrison and Mr. Whitaker both admitted at trial that they considered gender in making assignments of supervisors. It is clear that gender may appropriately be considered in assigning juvenile detention officers within a residential facility so that some duties are performed by an officer of the same gender as an offender. Whether that rationale extends to *supervisors* of line officers is less clear, as is the need for gender to be considered for more than some minimum number of officers on a given shift. In any event, Mr. Whitaker's stated explanations for Ms. Whitaker's shift assignments were in some respects false. The suggestion that gender played a role was by no means frivolous.

the nature of the change, and who caused it. The defense theory was that Ms. Redding became insubordinate. Ms. Redding's account was that she was mistreated in retaliation for her gender discrimination complaint. There was truth in both views. Ms. Redding was indeed subjected to retaliation. And in time she became bitter and insubordinate.[11]

The retaliation included keeping Ms. Redding on the evening shift even though other supervisors expressed their willingness to trade shifts and there was no reasonable basis for not approving the trade. Mr. Whitaker gave inconsistent and untrue explanations for his actions. He of course had every right to keep Ms. Redding on the evening shift, no matter how poor a management decision that might have been, so long as he did not do so based on Ms. Redding's gender or in retaliation for her gender complaints, but the jury could well have concluded that his explanations were pretextual, and that the real reason for his action was retaliation.[12]

---

[11] In its motion for judgment as a matter of law, defendant does not deny that the jury could have found the acts at issue retaliatory. Defendant's argument, instead, is that the acts were not sufficiently severe or pervasive to be actionable. On the question of whether the acts were indeed retaliatory, it bears noting that, in addition to the evidence of retaliation against Ms. Redding, there was unrebutted evidence that Mr. Whitaker retaliated against several other employees who crossed him.

[12] Defendant has asserted during this litigation that a shift change that does not affect pay cannot constitute an adverse employment action. Defendant admits, however, that an employer cannot assign an employee to an unfavorable shift

Mr. Whitaker also gave Ms. Redding a verbal reprimand and four "counseling" memoranda. The jury could have found that all of these were unfounded and pretextual. Thus, for example, Ms. Redding missed a staff meeting in May 2003 because of other duties. She explained this to Mr. Whitaker at the time, and he approved. But in August, promptly after Ms. Redding took further action on her earlier complaints (by calling a state employee hotline), Mr. Whitaker issued a verbal reprimand for missing the May meeting. Mr. Whitaker denied approving Ms. Redding's absence—a denial the jury was entitled to disbelieve—and his explanations of why he issued a verbal reprimand three months after the meeting rang hollow.[13]

---

explicitly in retaliation for having made a complaint of race or gender discrimination. But whether a reassignment is explicitly based on retaliation, or is proven by circumstantial evidence to be based on retaliation, does not affect the question whether the reassignment is sufficiently adverse to be actionable. In any event, in the case at bar keeping Ms. Redding on the unfavorable shift was just one of many actions taken against her in retaliation for her gender complaint. It was part of the totality of the circumstances that the jury was entitled to consider.

[13] Defendant asserts the counseling memoranda were not disciplinary in nature. But neither were they positive. I readily assume that the counseling memoranda, even in combination with the verbal reprimand, were not sufficient without more to rise to the required threshold level of substantiality. *See, e.g.*, *Davis v. Town of Lake Park*, 245 F.3d 1232, 1241 (11th Cir. 2001) (noting that "courts are wisely reluctant to treat job performance memoranda as actionable under Title VII where they do not trigger any more tangible form of adverse action"). But the counseling memoranda may nonetheless be considered, together with all the other facts and circumstances, in evaluating whether the required level of substantiality has been met.

Mr. Whitaker also canceled training that plaintiff had been scheduled to receive, consistently provided plaintiff insufficient staff,[14] undermined plaintiff's relations with her staff,[15] assigned plaintiff unfavorable duties,[16] refused to allow plaintiff to return to work after a medical absence until she provided an extraordinary verification of fitness for duty,[17] refused for nearly a month to allow plaintiff to work while wearing an unobtrusive heart monitor as directed by her physician,[18] constantly treated plaintiff disrespectfully,[19] and generally subjected

---

[14] The evidence was that Ms. Redding was provided insufficient staff and that other supervisors fared better.

[15] For example, Mr. Whitaker sometimes refused to communicate directly with Ms. Redding, instead dealt directly with her employees, and sometimes contradicted her instructions to her staff.

[16] For example, the evidence was that Mr. Whitaker consistently required Ms. Redding to complete routine maintenance and assignments left over from the prior shift while not requiring other supervisors to do so.

[17] Ms. Redding was absent for physician-verified mental health reasons brought on in substantial part by her shoddy treatment by Mr. Whitaker. A note from her physician clearing her to return to work was deemed insufficient, and Ms. Redding had to obtain several additional clearances before one was found acceptable.

[18] Mr. Morrison said that the device as first described to him raised security concerns: juvenile offenders could snatch hanging wires and put them to bad use. In fact, Ms. Redding's device was unobtrusive, had no hanging wires, and raised no real security concerns at all, as defendant eventually conceded (after a 29-day delay). This was another pretextual explanation for action adverse to Ms. Redding. Defendant now says it was only Mr. Morrison, not Mr. Whitaker, who was responsible for this action, and that the jury instructions focused only on Mr. Whitaker, so that Mr. Morrison's actions cannot support the verdict. But Mr.

plaintiff to an abusive work environment on a daily basis. The cumulative effect caused actual psychological harm, for which Ms. Redding received treatment.

The jury found these actions, in combination, sufficiently severe or pervasive to constitute an abusive work environment. The evidence fully supported that finding. And the conclusion that these effects, in combination, met the threshold level of substantiality required for an actionable Title VII claim fully accords with the law of the circuit.[20]

For these reasons,

IT IS ORDERED:

Defendant's renewed motion for judgment as a matter of law (document 88)

---

Morrison was an agent of the Department of Juvenile Justice, as surely as was Mr. Whitaker, and the Department is bound by the actions of both. Moreover, Mr. Whitaker was a participant in the heart monitor episode.

[19] Mr. Whitaker yelled at and talked over Ms. Redding. On other occasions he ignored her. In a boorish, trivial example of the unprofessional relationship that Mr. Whitaker created, he once refused to speak to Ms. Redding but instead held up a sign giving her instructions on where to go for a meeting.

[20] While each case is different and must be decided on its own facts, the sufficiency of the facts here, when taken in combination, is well illustrated by a comparison to *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998). *See supra* note 9. There the Eleventh Circuit held plaintiff had met the required level of substantiality. Ms. Redding's treatment was more severe and continued longer.

is DENIED.

SO ORDERED this 17th day of October, 2005.

s/Robert L. Hinkle
Chief United States District Judge